**LAIDLAW ENVIRONMENTAL SERVS., (TOC), INC., Plaintiff,**

**v.**

**HONEYWELL, INC., Defendant.**

C/A No. 7:95–473–21.

United States District Court,
D. South Carolina,
Spartanburg Division.

Sept. 18, 1996.

**1404**

Kellum Wright Allen, Kenneth W. Ebener, West Columbia, SC, for plaintiff.

John A. Hagins, Jr., Greenville, SC, Brad P. Engdahl, Matthew L. Woods, Randall Tietjen, Minneapolis, MN, for defendant.

## ORDER

TRAXLER, District Judge.

This case presents a study in the battle of the forms between two sophisticated corporate entities that, after thorough negotiations, arrived at a contract for the purchase of a computer control system. After two months of labored negotiation, the parties entered into a contract that provided Plaintiff Laidlaw Environmental Services (TOC), Incorporated, ("Laidlaw"), would purchase a computer control system from Defendant Honeywell, Incorporated ("Honeywell"). Despite this negotiated contract, in which Honeywell's disclaimer of warranties and limitation of remedies prevailed, Laidlaw now asserts that a pro forma purchase order, with pre-printed terms appearing on the reverse side, that it sent to Honeywell prior to the negotiations that culminated in the contract constitutes the agreement between the parties. According to Laidlaw, Honeywell's acceptance of this purchase order nullified the negotiated contract because of the pre-printed terms appearing on the reverse side of the purchase order, which purport to declare the parties' rights and remedies. In essence, therefore, Laidlaw urges the court to hold that two months of intense negotiations between counsel for sophisticated corporate entities were abrogated by Honeywell's pro forma reference to the purchase order in a two-sentence letter confirming the contract.

Honeywell posits that its reference to the purchase order did not form a new contract, but argues that the parties' written contract memorializing their bargained-for terms prevails. Based on the language in the contract that disclaimed warranties and limited Laidlaw's remedy to repair or replacement of the computer control system, Honeywell posits further, there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Accordingly, Honeywell has moved the court for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Concluding, as a matter of law, that the purchase order and letter of reference did not create a contract between the parties and concluding further that the plain language of the written contract disclaims warranties and limits Laidlaw to the exclusive remedy or repair or replacement, the court grants Honeywell's motion for summary judgment respecting all of Laidlaw's claims.

### I.

#### A.

Laidlaw operates a hazardous waste incineration facility in Roebuck, South Carolina. In 1991, Laidlaw desired to replace the aging computer control system that operated its facility, and in this regard, hired Lockwood Greene Engineers, Incorporated, ("Lockwood Greene"), an engineering firm, to prepare and issue a request for proposal ("RFP") to provide prospective bidders with "performance requirements and specifications" for a computer control system. Among the separate specifications for the system, the RFP provided that "[t]he Seller shall be responsible for becoming familiar" with certain codes and standards, including the requirements of the EPA and "insure full compliance" with those codes and standards. In addition, the RFP provided for certain "Instructions, Conditions and Terms" ("Instructions") for prospective bidders. These Instructions included terms and conditions that were to govern

an eventual agreement with any prospective seller. Any exceptions to the Instructions were to be clearly noted on a bidder's proposal, in which case such exceptions were to be construed as a counteroffer.

On July 2, 1991, Lockwood Greene issued the RFP to Honeywell, which manufactures control systems that monitor and control various industrial processes. On July 18, 1991, Honeywell responded to the RFP with a written proposal to provide Honeywell's "TDC 3000 Distributed Control System" ("TDC 3000 System"). In responding to the RFP, Honeywell expressly stated that its TDC 3000 System was "not offered in conformance with particular standards or codes, U.L., NFPA, EPA, etc., except as required by the United States Federal Law at the time of manufacture," and "consequently, strict compliance with the standards referred to [by the RFP was] not offered or implied." Material for purposes of this suit, Honeywell's response provided that it was offering its TDC 3000 System with certain express exceptions to Lockwood Greene's Instructions and subject to applicable sections of Honeywell's own "General Terms and Conditions," which were essentially disclaimers and limitations of remedy. In addition, Honeywell's response provided that acceptance of its terms would not be altered by subsequent purchase orders.

Thus, Honeywell excepted to many of Lockwood Greene's terms, consistently seeking to disclaim warranties and to limit Laidlaw's remedy to repair or replacement of the TDC 3000 System. Specifically, Honeywell expressly excepted to Article 12 of Lockwood Greene's Instructions with Article 6 of Honeywell's "General Terms and Conditions." Under the bold-lettered heading "**WARRANTY,**" Article 6 provided that Honeywell would take all reasonable steps to remedy, free of charge, any hardware design faults or software errors. Other than this warranty to repair or replace the hardware and software on the TDC 3000 System, Article 6 expressly disclaimed all other warranties:

> The foregoing warranty shall constitute the exclusive remedy of Customer and the exclusive liability of Honeywell for any

breach of any warranty related to the Equipment or Software supplied hereunder.

Additionally, Article 6 concluded with a disclaimer in capital letters, distinct in size from the other print on the document:

> THE WARRANTY SET FORTH HEREIN IS EXCLUSIVE, AND HONEYWELL EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Not only did Honeywell desire to disclaim warranties, but it also sought to limit Laidlaw to the exclusive remedy of repair or replacement of the TDC 3000 System. In this respect, Honeywell specifically excluded any incidental or consequential damages that might flow from any defects in the TDC 3000 System. Honeywell's express exceptions to Lockwood Greene's Instructions also included a requirement that any contract for the sale and purchase of the TDC 3000 System would include the limitation of remedy as set forth in Article 8, which provided in the same print as Article 6:

### LIMITATION OF LIABILITY

> IN NO EVENT SHALL HONEYWELL BE LIABLE FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES RESULTING FROM HONEYWELL'S PERFORMANCE, OR FAILURE TO PERFORM, PURSUANT TO THE CONTRACT, OR THE FURNISHING, PERFORMANCE, OR USE OF ANY EQUIPMENT OR SOFTWARE SOLD PURSUANT HERETO, WHETHER DUE TO A BREACH OF CONTRACT, BREACH OF WARRANTY, THE NEGLIGENCE OF HONEYWELL, OR OTHERWISE.

Lest these disclaimers and limitations on remedy be sacrificed in a battle of the forms, Honeywell explicitly demanded any pro forma acceptance of Laidlaw's purchase orders not operate to exclude the disclaimers and limitation of remedies:

## PROPOSAL ACCEPTANCE

All Honeywell proposals, all acceptance of Purchasers' orders, and all sales by Honeywell are expressly limited to, and expressly made conditional upon the Purchaser's acceptance of and assent to the General Terms and Conditions of Sales as set forth herein, not withstanding receipt of, or acknowledgment of, the Purchaser's order form or specifications containing additional or different provisions, or conflicting oral representations by any agent or employee of Honeywell.

The parties could not rotely accept the form contract of the other, so they commenced negotiations to achieve a mutually acceptable compromise. On August 13, 1991, Laidlaw sent Honeywell a Letter of Intent indicating that Laidlaw intended to purchase the computer system from Honeywell provided that the parties could agree upon all terms and conditions. The letter of intent also stated that the specific components for the system would be listed on a final purchase order in approximately two weeks.

Also, on August 29, 1991, during negotiation of the contract and prior to the contract's being memorialized, Laidlaw mailed a purchase order to Honeywell that provided in conspicuous lettering:

PLEASE FURNISH THE MATERIAL AND/OR SERVICE LISTED HEREON, SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND BACK HEREOF AND MADE A PART OF THIS ORDER, ALL OF WHICH SHALL CONSTITUTE A CONTRACT BETWEEN U.S. UPON ACCEPTANCE OF THIS ORDER.

The reverse side of this purchase order provided in pertinent part:

ACCEPTANCE. Any of the following acts by the supplier shall constitute acceptance of this order and all of its terms and conditions. . . . Any terms of condition stated by the Supplier in any prior proposal or in acknowledging or otherwise accepting this order shall not be binding on the Buyer unless specifically accepted in writing.

INSPECTION. No inspection . . ., tests, approval, or acceptance of items or services ordered shall relieve the Supplier from responsibility for defects or other failures to meet the requirements of this order. Rights granted to Buyer in this Article 6 are in addition to any other rights or remedies provided elsewhere in this order or in law.

WARRANTIES. In addition to any other express or implied warranties, the Supplier warrants the items or services furnished pursuant to this order will be (i) free from defects in workmanship and material, (ii) free from defects in design, except to the extent that such items comply with detailed designs provided by Buyer, (iii) suitable for the purposes, if any, which are stated on the face of the offer, and (iv) in conformity with all requirements of this order.

For breach of warranty above, in addition to any other rights Buyer may have . . . Buyer may return such items or . . . reperform such work at the Supplier's expense for correction, replacement or credit as Buyer may direct. Any items or work corrected or furnished in replacement shall also be subject to all the provisions of these Terms and Conditions to the same extent as items initially furnished.

COMPLIANCE WITH LAWS. In performance of this order the Supplier shall comply with all Federal, State and local laws, rules and regulations, including, but not limited to . . . environmental protection statutes and regulations.

Finally, the purchase order noted that "[p]riority of the terms and conditions of these provisions shall supersede any conflicting terms of any attached order form."

### B.

Throughout August and September 1991, Laidlaw through its corporate counsel, Mollie DuPriest ("DuPriest"), held a series of negotiations with Honeywell's corporate counsel, Ernie Scalzo ("Scalzo"), for the purpose of resolving the differences between Laidlaw's terms and Honeywell's terms. The gravamen of these negotiations was determining which warranties and remedies would pre-

vail. As part of these negotiations, Honeywell and Laidlaw exchanged numerous drafts of terms in an effort to consummate the sale of the TDC 3000 System. DuPriest agreed that throughout these negotiations she was aware that Honeywell insisted that Honeywell's disclaimer-of-warranties and limitation-of-liability provisions be included as part of any deal.

These labored, arm's-length negotiations culminated in a contract in which Honeywell's disclaimers and limitations of remedy prevailed: By September 5, 1991, the parties were nearing an agreement that disclaimed any warranties regarding the TDC 3000 System and limited Laidlaw to the remedy of repair or replacement. The contract also provided for certain modifications that did not relate to Articles 6 or 8. The parties finalized these modifications in mid-late September 1991, and termed their contract "Modifications and Changes to Honeywell's General Terms and Conditions" ("the contract"). This contract was signed by David M. Sprinkle ("Sprinkle"), a Senior Vice President of Laidlaw, and Laidlaw sent a copy of the contract with Sprinkle's signature to Honeywell by September 27, 1991. In her deposition, DuPriest did not dispute that, as modified, Laidlaw had agreed to Honeywell's General Terms and Conditions:

> Q: Is it fair to say by evidence of Mr. Sprinkle's signature that Laidlaw had agreed to these modifications and changes to Honeywell's general terms and conditions?
>
> A: It would appear that that's what that signature means.

DuPriest's testimony in this regard comports with Laidlaw's subsequent conduct because throughout the course of dealing with Honeywell, Laidlaw has conducted itself as though the terms in the contract prevailed, its present legal argument concerning the purchase order notwithstanding. Thus, the agreement that the parties assented to did not reflect the terms provided for by Laidlaw's August 29, 1991 purchase order, but in fact, were expressly contrary to them respecting Honeywell's disclaimer of warranties and limitation of remedies.

On September 30, 1991, after reviewing the document signed by Laidlaw, Scalzo replied with a letter to Laidlaw acknowledging receipt and acceptance of Laidlaw's purchase order, and herein lies the issue in this suit. This letter provided in its entirety:

> Receipt and acceptance of the subject Purchase Order is hereby acknowledged.
>
> For information concerning the status of this Order, kindly contact our Project Manager, Mr. Bob Thomas, in our Atlanta, GA facility at (404) 248–2584.

No further negotiations of substance occurred after Honeywell's receipt of Laidlaw's signed copy of the contract and Honeywell's letter of confirmation. Now, after a dispute over the effectiveness of the TDC 3000 System has arisen, Laidlaw contends that Scalzo's letter nullified all prior negotiations and the parties' written contract because of the reference to the purchase order in Scalzo's letter. Laidlaw contends that the reference to the purchase order meant that Scalzo was offering to abjure all of the negotiations, forego the written contract sent by Laidlaw containing the terms favorable to Honeywell for which Honeywell had so arduously worked, and instead agree to accept the pre-printed terms on the back of the original purchase order that were the complete opposite of the terms for which Honeywell had bargained. Thus, the theory of Laidlaw's contention is that even though this pro forma purchase order pre-dated the parties' contract, and was contrary to it regarding Honeywell's obligations respecting disclaimer of warranties and limitation of remedies, it operates as the contract between the parties because Scalzo "accepted" its terms subsequent to the parties' memorializing their agreement.

## C.

The parties' agreeing that Laidlaw would purchase the TDC 3000 System, in late 1991, Honeywell assembled the hardware and developed the software necessary for fulfilling Laidlaw's requirements as specified in the RFP. In December 1991, several representatives from Laidlaw traveled to Honeywell's manufacturing facility to conduct a Factory Acceptance Test, i.e., to review the hardware

and software of the TDC 3000 System. Laidlaw approved the equipment, and in late December 1991, or early January 1992, the TDC 3000 System was installed at Laidlaw's facility in Roebuck.

Pursuant to the written contract, as Honeywell completed various stages of installing the TDC 3000 System, it submitted invoices for "milestone" payments associated with each stage. The timing of these invoices and the specific amounts requested corresponded to a schedule set forth in the written contract, and consistent with its obligations under the contract, Laidlaw paid the invoices as submitted. In addition to the milestone payments, Honeywell and Laidlaw had agreed in the written contract to certain bonuses or penalties that Honeywell would receive or suffer if it completed installation earlier or later than anticipated. Honeywell completed its work ahead of schedule, so Laidlaw paid Honeywell an early completion bonus that corresponded to the formula provided in the written contract.

### D.

From September 1990 until March 1994, Laidlaw was required to operate its Roebuck incinerator plant according to certain conditions specified in a stay order issued by the United States Court of. Appeals for the Fourth Circuit on September 4, 1990, and later amended. As amended, this stay order required that Laidlaw operate its facility in accordance with special air-pollution-control provisions under the Resource Conservation and Recovery Act, *see* 42 U.S.C.A. §§ 6901–6992k (West 1995). In the three years following installation of the TDC 3000 system, Laidlaw was penalized by the EPA on four occasions for failing to comply with the provisions that relate to the monitoring and measurement of carbon monoxide, but these provisions were not set forth in the RFP. In addition to the penalties imposed by the EPA, Laidlaw incurred expenses in connection with proper maintenance of the TDC 3000 System.

On each of the four occasions, Honeywell changed the system programming once Laidlaw notified it that the programming needed to be changed and provided Honeywell with

the revised specifications. Critically, there is no evidence that the TDC 3000 System exploded, injured any person or property, or caused the release of toxic substances into the environment. Indeed, Laidlaw continues to use the TDC 3000 System at its Roebuck facility.

### E.

Asserting that Honeywell is liable for the penalties imposed by the EPA and the expenses incurred in repairing and maintaining the computer control system, Laidlaw, invoking the court's diversity jurisdiction, asserted five claims against Honeywell: (1) breach of contract; (2) breach of warranty; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of common law warranty of services; and (5) negligence. Laidlaw alleges that the fines imposed by the EPA resulted from Honeywell's improper programming of the TDC 3000 System and seeks to recover the fines, as well as incidental and consequential expenses of attorneys' fees incurred in negotiations with the EPA, lost profits allegedly resulting from the time its incinerator was shut down after the incidents, and capital expenditures allegedly required by the EPA as a condition of avoiding other penalties. Honeywell moves the court for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

### II.

Federal Rule of Civil Procedure 56(c) requires that summary judgment "shall be rendered forthwith" for Honeywell if "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." A fact is "material" if proof of its existence or nonexistence would affect the disposition of the case under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" only if a reasonable jury might return a verdict for the non-movant with the evidence offered. *See id.* at 257, 106 S.Ct. at 2509–10. In opposing Honeywell's motion, Laidlaw cannot rest on the allegations in its pleadings nor can it "'create a genuine issue of material fact through mere

speculation or the building of one inference upon another.'" *See Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.,* 843 F.Supp. 1027, 1034 (D.S.C.1993) (quoting *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985)), *aff'd,* 46 F.3d 1125 (4th Cir.1995) (per curiam) (unpublished) (affirming summarily the reasoning of the district court). Rather, Laidlaw "must demonstrate that specific, material facts exist that give rise to a genuine issue." *See id.* If the evidence "is so one sided that one party must prevail as a matter of law, the court must enter summary judgment" in that party's favor. *Id.* In this regard, "[s]ummary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become 'entrenched in a frivolous and costly trial.'" *Id.* at 1035 (quoting *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987)). This procedural standard applies to all of Laidlaw's claims, which the court addresses seriatim.

## A.

 Laidlaw's first contention appears to be that the September 27, 1991 contract it executed and returned to Honeywell was not an "acceptance," but an "offer." A federal court exercising its diversity jurisdiction, as here, must apply the substantive law of the forum state, *see Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), so South Carolina law applies to this suit. Pursuant to South Carolina law, conduct manifesting assent constitutes acceptance of the offered terms. *See Ex parte Stevens, Stevens & Thomas,* 277 S.C. 150, 283 S.E.2d 444, 445 (1981) (per curiam). Thus, compliance with the proffered terms and conditions constitutes acceptance of an offer, *see Davis & Clanton v. C.I.T. Corp.,* 190 S.C. 151, 2 S.E.2d 382, 383 (1939), and assent need not be express, but may be inferred from the parties' conduct, *see Shealy v. Fowler,* 182 S.C. 81, 188 S.E. 499, 503 (1936). As applied to the South Carolina Uniform Commercial Code, "an expression of acceptance of an offer creates a contract on the offered terms despite additional or different terms contained in the acceptance unless the acceptance is expressly made conditional on assent to the additional or different

terms." *Mace Indus. v. Paddock Pool Equip. Co.,* 288 S.C. 65, 339 S.E.2d 527, 529–30 (App.1986). These principles compel the conclusion that this contention is meritless. Here, Laidlaw signed and returned to Honeywell the contract that the parties assented to after lengthy negotiations, thereby manifesting its assent. Not only did Laidlaw execute and return the contract, but it conducted itself as though the negotiated contract controlled the parties' obligations, reinforcing the conclusion that it accepted the written contract it executed. Finally, Laidlaw's alleged "offer" (really the acceptance) did not, pursuant to *Mace Indus.,* state that its acceptance was expressly conditional on assent to different or additional terms. The fact that Honeywell did not sign the contract is of no moment, *see Al–Salamah Arabian Agencies Co. v. Reece,* 673 F.Supp. 748, 750 (M.D.N.C.1987), because under South Carolina law, a contract is valid if signed by only one party, *see Bishop Realty & Rentals v. Perk, Inc.,* 292 S.C. 182, 355 S.E.2d 298, 300 (App.), *cert. denied,* 293 S.C. 538, 362 S.E.2d 26 (1987); *see also* S.C.Code Ann. 36–2–201(1) (Law.Co-op.1976) (providing that a contract is enforceable if signed by the party against whom it is to be enforced). Laidlaw, therefore, can take no solace, nor attach any legal significance, to the fact that Honeywell failed to sign the contract.

## B.

Second, Laidlaw contends that Scalzo's letter acknowledging receipt and acceptance of the purchase order dramatically altered the relationship between the parties because it spontaneously created a new contract. Laidlaw advances this contention even though this purchase order was sent *prior* to the completion of the parties' negotiations and subsequent written contract, albeit Scalzo's confirmation letter post-dated the written contract. According to Laidlaw, no contract was consummated by its signing and returning the written contract to Honeywell because there is no evidence that this document was "accepted" and that, therefore, the only contract terms would be those found in the original purchase order that Scalzo's letter referenced. For reasons stated through-

out this order, the court rejects that position as meritless. At best, Laidlaw is arguing that a novation occurred on Scalzo's acknowledgement of receipt and acceptance of the purchase order. Because the purchase order does not permit Honeywell to disclaim warranties and limit remedies, Laidlaw maintains that Honeywell is liable for all of its damages.

Conversely, Honeywell asserts that Scalzo's letter acknowledged the contract that the parties bargained over and reduced to writing. According to Honeywell, therefore, Scalzo's letter did not constitute a novation but merely referenced the existing contract. In advancing this argument, Honeywell maintains that Laidlaw's theory is unreasonable as a matter of law because the parties hammered out the terms of a contract over a two-month period and memorialized their agreement in writing. Additionally, Honeywell maintains that Laidlaw's theory disregards the fact that Laidlaw performed pursuant to the written contract, not the purchase order. Honeywell posits, therefore, that Laidlaw should be estopped from asserting that the purchase order now dictates the parties' obligations. Completing its argument, Honeywell contends that because it disclaimed warranties, limited Laidlaw's remedies to repair or replacement, and has satisfied its burdens under the contract, it is entitled to summary judgment.

### 1.

The parties do not dispute that they entered into a contract; the dispute is over which of two "contracts" controls. Under South Carolina law, "[a] novation is . . . a mutual agreement between all concerned parties for the discharge of a valid existing obligation by the substitution of a new valid obligation on" behalf of the parties. *Superior Automobile Ins. Co. v. Maners,* 261 S.C. 257, 199 S.E.2d 719, 722 (1973) (per curiam). To establish a novation, Laidlaw must prove the existence of "a previous valid obligation, agreement of all parties to the new contract, extinguishment of the old, and the making of a valid new contract," *see Callaham v. Ridgeway,* 138 S.C. 10, 135 S.E. 646, 649 (1926), and in proving these elements, the parties' intent to form a new contract is of paramount importance, *see Superior Automobile,* 199 S.E.2d at 722. In addition to examining the parties' intent to form an entirely new contract, the court examines any terms used in the purportedly new contract as well as the surrounding circumstances. *See id.* The burden of establishing that a new contract was formed rests with Laidlaw, *see id.,* and while the majority of courts hold that this burden must be satisfied by clear and convincing evidence, *see, e.g., Dunlop Tire & Rubber Corp. v. Thompson,* 273 F.2d 396, 399 (8th Cir.1959) (applying Arkansas law); *Spering v. Sullivan,* 361 F.Supp. 282, 287 (D.Del.1973) (applying Delaware law); *In re Hassebroek,* 136 B.R. 527, 530 (Bankr. N.D.Iowa 1991) (applying Iowa law); *The Florida Bar v. Quick,* 279 So.2d 4, 8 (Fla. 1973); *Fort Mohave Farms, Inc. v. Dunlap,* 96 Ariz. 193, 393 P.2d 662, 663 (1964); *Lagarde v. Elms,* 541 So.2d 413, 416 (La.Ct. App.1989); *Zinn v. Walker,* 87 N.C.App. 325, 361 S.E.2d 314, 320 (1987), *disc. rev. denied,* 321 N.C. 747, 366 S.E.2d 871 (1988); *General Ins. Co. of Am. v. Klein,* 517 S.W.2d 726, 730 (Mo.Ct.App.1974), no reported decisions of the South Carolina courts have determined the burden of proof for establishing a novation under South Carolina law. The fact that the South Carolina courts have not expressly stated that the clear-and-convincing standard applies tends to indicate that South Carolina would merely require a preponderance of the evidence. Honeywell's reaffirming its obligations under an extant contract and requesting that Laidlaw comply with the terms of the extant contract do not constitute a novation. *See King Constr. Co. v. W.M. Smith Elec. Co.,* 350 S.W.2d 940, 942 (Tex. Civ.App.1961), *writ ref'd n.r.e.,* (Tex. Apr. 11, 1962). Even if a new contract was formed, "the making of a second contract dealing with the same subject matter does not necessarily abrogate the former contract between the same parties." *Zinn,* 361 S.E.2d at 320.

Applying these principles, the court concludes as a matter of law that the purchase order and Scalzo's acceptance of it did not form a new contract. Laidlaw cannot prove by a preponderance of the evidence that the parties agreed, as manifested by their intent, to form a new contract because

the only reasonable reading of Scalzo's letter is one that the parties would perform according to the contract they negotiated. *See LCA Leasing Corp. v. Borvig Corp.,* 826 F.Supp. 776, 779–80 (S.D.N.Y.1993) (holding that an original agreement was not superseded by a pro forma lease agreement that was signed after the terms were agreed to by a letter because the pro forma lease agreement did not provide for discharge of obligations set forth in the letter nor did it address other material points on which the parties agreed); *Lagarde,* 541 So.2d at 416 (holding alternatively that a letter did not result in a new contract, particularly in light of a negotiated contract, because the letter failed to provide for the parties' new obligations and failed to express an intention to extinguish the original obligations provided in the original contract); *Ensign Painting Co. v. Alfred A. Smith, Inc.,* 21 Mich.App. 494, 175 N.W.2d 789, 793 (1970) (rejecting a like argument as Laidlaw presents and holding that a purchase order sent by a general contractor to a subcontractor providing for additional construction work failed to constitute a new agreement that superseded the parties' original contract), *rev'd on other grounds,* 385 Mich. 268, 188 N.W.2d 534 (1971). Here, the purchase order and letter do not evince an intention that the parties desired to nullify two months of intense negotiations that culminated in a written instrument. *See King Constr. Co.,* 350 S.W.2d at 942–43 (holding that there was no novation because the parties' conduct did not establish that they intended to extinguish the extant contract and form a new contract). At most, Scalzo's letter was merely a method of notifying Laidlaw that the extant, written contract would proceed. *See Production Credit Ass'n v. Alamo Ranch Co.,* 989 F.2d 413, 418 (10th Cir.1993) (observing that a telephone conversation between two parties to a contract that established that the buyer would remit proceeds from the sale of goods to cover the purchase price it owed the seller did not constitute a novation but was merely a method for establishing payment); *Forsyth Mun. Alcoholic Beverage Control Bd. v. Folds,* 117 N.C.App. 232, 450 S.E.2d 498, 501–02 (1994) (holding that the execution and delivery of an agreement in which a purchaser granted a buyer of realty an easement without mentioning any obligations on the seller's behalf did not constitute a novation eliminating the seller's construction obligations as provided in the parties' written sale contract). According to Laidlaw, because Honeywell did not specifically reference the original contract in its September 30, 1991 letter, that letter served as an unconditional acceptance of Laidlaw's purchase order, but this strained, artificial interpretation of the legal effect of Honeywell's letter is not supported by the record. Rather, such an interpretation directly conflicts with the parties' course of conduct and the negotiations that culminated in Laidlaw's signing the original contract. Laidlaw's construction of the contract thus cannot stand because it is taken completely out of context of the other documents and events that form the substance of this transaction. *See Scott v. Stone,* 149 S.C. 386, 147 S.E. 449, 453 (1929) (examining the circumstances surrounding the execution of various mortgages in determining whether a novation occurred). Moreover, Honeywell's General Terms and Conditions—to which Laidlaw had agreed several days prior to the letter—explicitly provided that acceptance of any purchase order is expressly conditional on Laidlaw's assent to Honeywell's terms, notwithstanding receipt and acknowledgment of any purchase order. Accordingly, the court concludes as a matter of law that the purchase order and letter did not constitute a new agreement between the parties; any other construction would lead to an unreasonable result: Here, sophisticated parties, represented by counsel, engaged in detailed negotiations for a period of two months, finally arrived at terms mutually acceptable to both parties, and memorialized their agreement in a written instrument. To hold that a pro forma purchase order and a pro forma response that in no way evidenced that the original, written contract was extinguished and a new contract was formed defies common sense.

■ Even if the purchase order and Scalzo's letter could be construed as creating a superseding contract, Laidlaw conducted itself as though the original, negotiated contract controlled, such as making the

milestone payments and awarding the early completion bonus. Such acquiescence establishes that Laidlaw concluded that the original contract controlled. *See* S.C.Code Ann. § 36–2–208(1) (Law.Co-op.1976) (providing that course of performance is material for determining meaning of a contract); *Al–Salamah Arabian Agencies Co. v. Reece*, 673 F.Supp. 748, 750 (M.D.N.C.1987) (holding that the parties' performance pursuant to the terms of the contract prior to the defendant's signing it required enforcement of the contract); *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 83 (Tex.Ct.App.1996) (explaining, in a commercial context, that acquiescence can operate against a party), *error dismissed*, (July 8, 1996); *Joseph v. Atlantic Basin Iron Works*, 132 N.Y.S.2d 671, 673 (Sup.Ct.1954) (accepting and performing work called for in a purchase order indicated acquiescence to the contract), *aff'd*, 285 A.D. 1147, 143 N.Y.S.2d 601 (1955). The court concludes that because Laidlaw conducted itself as though the original contract declared the parties' obligations, it cannot now assert that the purchase order and letter created a new contract. Therefore, the court holds as a matter of law that the negotiated, original contract controls the parties' rights and remedies.

### 2.

 Having concluded that the original contract controls, the issue now becomes determining whether that contract is ambiguous. In examining a contract to determine if it is ambiguous, the court first examines "the language of the contract to determine the intention of the parties," *C.A.N. Enters., Inc. v. South Carolina Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 373 S.E.2d 584, 586 (1988), and "if such is perfectly plain and capable of legal construction, such language determines the force and effect of the instrument," *Blakeley v. Rabon*, 266 S.C. 68, 221 S.E.2d 767, 768 (1976). In undertaking this examination, the court must examine "the entire contract and not ... isolated portions of the contract." *Farr v. Duke Power Co.*, 265 S.C. 356, 218 S.E.2d 431, 433 (1975). The court must analyze the contractual language in its "plain, ordinary and popular sense," *C.A.N. Enters., Inc.*, 373 S.E.2d at

586, "except with technical language or where the context requires another meaning," *Blakeley*, 221 S.E.2d at 768. Under South Carolina law, "[a] contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Id.* If a contract is not ambiguous, the court is confined to enforcing the contract as written, *see Sloan v. Colonial Life & Accident Ins. Co.*, 222 S.C. 248, 72 S.E.2d 446, 449 (1952), "regardless of its wisdom or folly, apparent unreasonableness, or failure to guard the [parties'] rights carefully," *Blakeley*, 221 S.E.2d at 769. Giving effect to an unambiguous contract is a question of law for the court. *See Holden v. Alice Mfg., Inc.*, 317 S.C. 215, 452 S.E.2d 628, 631 (App.1994).

### a.

 Regardless of which document controls, it is subject to the South Carolina Commercial Code, *see Kline Iron & Steel Co., Inc. v. Gray Communications Consultants, Inc.*, 715 F.Supp. 135, 140 (D.S.C.1989) (holding that the terms of a contract, including references to delivery and the use of warranty language, are peculiar to goods, not services, and show sale of goods), an issue that the parties do not dispute. Here, regarding the disclaimer of warranties, the written contract provides:

> THE WARRANTY SET FORTH HEREIN IS EXCLUSIVE, AND HONEYWELL EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Beyond cavil, this language is clear and unambiguous, and this court has sustained like disclaimers between two sophisticated corporate entities, as here. *See Myrtle Beach Pipeline Corp.*, 843 F.Supp. at 1037–45. The contract expressly provides that the sole remedy available to Laidlaw is repair or replacement of the TDC 3000 System, expressly disclaims all other warranties by Honeywell, including the warranty of fitness for a particular purpose, and also expressly relieves Honeywell of liability for incidental,

indirect, consequential or special damages suffered by Laidlaw. The disclaimer is valid and enforceable against Laidlaw under South Carolina law. *See id.* Moreover, since Article 6 expressly disclaims any warranty other than the warranty to repair or replace, there is simply no foundation for Laidlaw's first, second, third and fourth causes of actions.* The court must now determine the proper remedy.

### b.

### i.

■ Respecting the limitation of remedy, the contract provides:

IN NO EVENT SHALL HONEYWELL BE LIABLE FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES RESULTING FROM HONEYWELL'S PERFORMANCE, OR FAILURE TO PERFORM, PURSUANT TO THE CONTRACT, OR THE FURNISHING, PERFORMANCE, OR USE OF ANY EQUIPMENT OR SOFTWARE SOLD PURSUANT HERETO, WHETHER DUE TO A BREACH OF CONTRACT, BREACH OF WARRANTY, THE NEGLIGENCE OF HONEYWELL, OR OTHERWISE.

While Article 6 disclaims theories of recovery, Article 8 limits Laidlaw's remedy to repair or replacement, a valid limitation, *see id.* at 1040–45, specifically excluding incidental and consequential damages, and such exclusion is proper as between two sophisticated entities dealing at arm's length. *See id.* at 1045–48.

### ii.

■ Having concluded that such exclusions can be valid, the inquiry is refined to determining whether the limited remedy of repair or replacement failed of its essential purpose, and resolution of this inquiry entails determining whether Honeywell "will not or cannot repair or replace the defective product with a conforming product or there is unreasonable delay in repair or replacement." *See id.* at 1043. Because Honeywell

indisputably remedied the alleged errors, Laidlaw has already received the only remedy to which it is entitled. *See Hill v. BASF Wyandotte Corp.,* 696 F.2d 287, 292 (4th Cir.1982) (upholding the limited remedy of repair or replacement under South Carolina law and explaining that, because of limitations of remedy in a contract, this was the exclusive remedy to which plaintiff was due); *Myrtle Beach Pipeline Corp.,* at 1036–1042 (same). Honoring its obligations under the contract, Honeywell has effected repair or replacement, so there is no failure of essential purpose, an issue that Laidlaw does not genuinely press. *See id.* at 1043 (collecting authorities holding that if a seller provides timely repair or replacement, there is no failure of essential purpose). Because the TDC 3000 System did not self-destruct, destroy property, or injure any persons, the damages sought by Laidlaw are clearly incidental and consequential and cannot be recovered as a matter of law, unless their exclusion is unconscionable, *see id.,* the issue to which the court now turns.

### iii.

■ Further honing the inquiry, the issue becomes whether the exclusion of consequential and incidental damages is unconscionable. *See* S.C.Code Ann. § 36–2–719(3) (Law.Co-op.1976). Various factors guide the court in determining the unconscionability of excluding incidental and consequential damages:

(1) the nature of the injuries suffered by [Laidlaw]; (2) whether [Laidlaw] is a substantial business concern; (3) disparity in the parties' bargaining power; (4) the parties' relative sophistication; (5) whether there is an element of surprise in the exclusion; and (6) the conspicuousness of the clause.

*See Myrtle Beach Pipeline Corp.,* 843 F.Supp. at 1046 (internal quotation marks omitted). Application of these factors establishes that the exclusion of consequential and incidental damages is not unconscionable:

---

* Laidlaw's fourth cause of action for breach of implied warranty of services fails for another reason: given that the parties' contract is primarily one for goods, the implied warranty of services is inapplicable to this action.

Laidlaw's injuries are commercial in nature for their gravamen concerns the sale and purchase of a product; Laidlaw is a substantial business concern that negotiated at arm's length with another sophisticated party, and both parties were represented by counsel; moreover, there was no surprise regarding the limitation of remedy because since the inception of their negotiations, Honeywell has sought to disclaim warranties and limit remedies; finally, the exclusion was conspicuous, being printed in large, capital letters.

### C.

As an alternative to its contractual claims, Laidlaw attempts to advance a negligence claim, generally alleging that Honeywell failed to fulfill its obligations under the contract. Laidlaw cannot prosecute a negligence claim, however, because such a claim is barred as a matter of law under Articles 6 and 8, which expressly exclude recovery of the types of damages Laidlaw seeks, even under a negligence theory. *See South Carolina Elec. & Gas Co. v. Combustion Eng'g, Inc.*, 283 S.C. 182, 322 S.E.2d 453, 459 (App. 1984) (sustaining a like exculpatory clause between two sophisticated entities because the parties chose to contract with each other, and thus their obligations were grounded in the law of contract, not tort, bargained at arm's length, and enjoyed equal bargaining power). Accordingly, South Carolina law precludes Laidlaw's attempting to assert a tort claim against Honeywell.

Laidlaw's tort claim is likewise barred by the economic loss rule. In *Kennedy v. Columbia Lumber & Mfg.*, 299 S.C. 335, 384 S.E.2d 730, 736 (1989), the Supreme Court of South Carolina concluded:

> Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic losses." Conversely, where a purchaser buys a product which is defective and physically harms him, his remedy is in either tort or contract.

The economic loss rule is founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of contract. *See Myrtle Beach*, 843 F.Supp. at 1049; *Bishop Logging Co. v. John Deere Indus. Equip. Co.*, 317 S.C. 520, 455 S.E.2d 183, 186 (App.1995). In applying the rule in the context of a commercial setting, the *Kennedy* court explained that "[t]he 'economic loss rule' will ... apply where duties are created *solely* by contract. In that situation, no cause of action in negligence will lie." *Kennedy*, 384 S.E.2d at 737. In *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 463 S.E.2d 85 (1995), the Supreme Court of South Carolina reaffirmed its conclusion that the economic loss rule applies to bar a tort claim if the parties' obligations are grounded exclusively in contract, explaining that "[a] breach of duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie." *Id.* 463 S.E.2d at 88. Thus, "[i]n most instances, a negligence action will not lie when the parties are in privity of contract." *Id.* The *Tommy L. Griffin* court observed, however, that the rule will not apply "if there is a special relationship between the alleged tortfeasor and the injured party not arising in contract." *Id.* If a "special relationship" is present, a tort action will lie. *See id.* A buyer-seller relationship does not constitute a "special relationship" precluding operation of the rule. *See Myrtle Beach Pipeline Corp.*, 843 F.Supp. at 1065 (explaining that there is nothing unique or special concerning a vendor-vendee relationship) (collecting authorities).

Here, Laidlaw has not demonstrated that Honeywell owed it any duty other than that bargained for in the contract. Indeed, Laidlaw's negligence allegations mirror its breach of contract allegations and even reference the parties' contract as the source of the alleged duty. Thus, the only duty between the parties is derived directly from the contract. Absent an independent duty, Laidlaw's negligence claim is barred by the economic loss rule. *See id.* at 1048–56 (holding that the economic loss rule precluded a sophisticated corporate buyer from asserting a

tort claim against a sophisticated corporate seller because the parties' obligations were defined in a contract under which the seller disclaimed warranties and limited remedies) *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39, 42 (D.S.C.1974) (holding that because the gravamen of complaint was that computer system failed to meet buyer's economic expectations, essence of action was in contract, not tort). The case law compels the conclusion, therefore, that Laidlaw may not bring a negligence claim against Honeywell.

### D.

■ Finally, Laidlaw posits that it is entitled to recover damages under a theory of indemnification. Relying on a provision in the contract providing that Honeywell will hold Laidlaw harmless from "all claims for injury, including death and material damage, arising out of design and construction ... of equipment furnished by Honeywell," Laidlaw asserts that Honeywell must indemnify it for the penalties imposed by the EPA and the expenses incurred by the alleged defect in the TDC 3000 System. This provision, however, does not entitle Laidlaw to recover the losses which it has directly suffered.

■ A claim for indemnification arises if a third party has been injured and the indemnitee has had to compensate the third party for that injury. *See Loyola Federal Sav. Bank. v. Thomasson Prop.*, 318 S.C. 92, 456 S.E.2d 423, 424 (App.1995). Losses as between the contracting parties are not the subject of indemnification. *See Smoak v. Carpenter Enters., Inc.*, 319 S.C. 222, 460 S.E.2d 381, 383 (1995). Laidlaw's claims for lost revenues, attorneys fees, and capital expenditures are not the losses of a third party, but are losses that Laidlaw directly incurred. Similarly, the EPA penalties assessed against Laidlaw are not compensation for injury to a third party, but are civil fines imposed to deter non-compliance, again constituting losses directly incurred by Laidlaw, and they are not the proper subjects of an indemnification claim. *See Elican Holdings, Inc. v. Hudson Oil Refining Corp.*, 96 A.D.2d 792, 466 N.Y.S.2d 22, 23 (1983). As this court exhaustively explained in *Myrtle Beach*

*Pipeline Corp.*, Laidlaw simply cannot recover under any indemnity theory. *See* 843 F.Supp. at 1063–65.

### III.

The court concludes that the written contract signed by Laidlaw is the instrument that declares the rights and remedies of the parties, as no new or different contract was formed by Laidlaw's purchase order and Honeywell's confirmation letter. By the express terms of this written contract, the parties agreed to permit Honeywell to disclaim warranties and limit Laidlaw's remedy to repair or replacement of the TDC 3000 System. Because the limited remedy did not fail of its essential purpose, consequential and incidental damages were excluded, the exclusion of which was not unconscionable, and Honeywell provided the promised remedy, Laidlaw cannot succeed on any of its claims sounding in contract as a matter of law. Additionally, because the parties' duties are governed exclusively by contract, Laidlaw cannot assert a negligence claim against Honeywell. Finally, Laidlaw is not entitled to indemnity. Honeywell's motion for summary judgment is therefore granted.

**IT IS SO ORDERED.**